Jack KEANE and Concerned Citizens
of Bristol Bay, Appellants,

v.

LOCAL BOUNDARY COMMISSION and
Incorporators of the City of Pilot
Point, Intervenors, Appellees.

No. S–5370.

Supreme Court of Alaska.

April 14, 1995.

Andrew M. Hemenway, Anchorage, for appellants.

Marjorie L. Odland, Stephen Slotnick, Asst. Attys. Gen., Juneau, Charles E. Cole, Atty. Gen., Juneau, for appellee Local Boundary Commission.

Bruce F. Stanford, Anchorage, for intervenors and appellees Incorporators of City of Pilot Point.

Glen K. Vernon, King Salmon, for amicus curiae Lake and Peninsula Borough.

Before MOORE, C.J., RABINOWITZ, MATTHEWS, COMPTON, JJ., and BRYNER, J. Pro Tem.*

## ORDER

On consideration of the petition for rehearing, filed on November 18, 1994, IT IS ORDERED:

1. The petition for rehearing is GRANTED to the extent that the final sentence of the opinion is deleted and replaced with the following sentence: "Finally, we conclude that Keane is a public interest litigant and therefore REVERSE the superior court's awards of attorney's fees, and REMAND the issue of attorney's fees to the superior court for redetermination."

a. Opinion No. 4145, issued on November 18, 1994, is WITHDRAWN.

b. Opinion No. 4187 is issued today in its place.

* Sitting by assignment under article IV, section 16 of the Alaska Constitution.

2. The petition for rehearing is DENIED in all other respects.

Entered by direction of the Court at Anchorage, Alaska on April 14, 1995.

Before MOORE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, J. Pro Tem.**

## OPINION

COMPTON, Justice.

This appeal arises from a decision of the Local Boundary Commission (LBC) approving the incorporation of the City of Pilot Point. Jack Keane and Concerned Citizens of Bristol Bay (collectively Keane) argue that the LBC's decision lacks a reasonable basis, that it is based upon an illegal tax, and that it is contrary to Alaska law. In addition, Keane appeals the following discreet superior court decisions: (1) the decision to allow the incorporators of Pilot Point (Incorporators) to intervene, (2) the decision to deny Keane's request for a stay pending appeal, (3) the decision to deny Keane public interest status, and (4) the decision to award attorney's fees to the LBC and the Incorporators.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Pilot Point is located within the Lake and Peninsula Borough[1] (Borough), on the shores of Bristol Bay. Voters from the Pilot Point area prepared a petition seeking incorporation of Pilot Point as a second class city. The petition included a request that incorporation be conditioned on approval of a three percent sales and use tax on the sale of fish in the community.

After review and approval by the Department of Community and Regional Affairs (DCRA), the petition was presented to the LBC. Following a public hearing, the LBC approved an amended petition. Both incorporation and the sales and use tax were approved by the voters of Pilot Point.

Keane appealed the LBC decision to the superior court, and filed a motion to stay certification of the incorporation election results. The Incorporators filed a motion to intervene in the appeal and an opposition to the motion to stay. The LBC aligned itself with the Incorporators, supporting the motion for intervention and opposing the motion to stay. Keane opposed the Incorporators' motion to intervene. The superior court granted the motion to intervene, denied the motion for a stay and allowed certification of the election results. Keane then sought review of the superior court's order by filing an Emergency Motion for Stay in this court. The motion was denied. (No. S–4922 Order, January 21, 1992). The superior court affirmed the LBC's decision approving the petition for incorporation. The Incorporators and the LBC then filed motions for attorney's fees. Keane opposed both motions, claiming public interest litigant status. The court denied Keane's request and awarded partial attorney's fees to the LBC and the Incorporators in the amount of $1,500 and $11,350, respectively. This appeal followed.

## II. DISCUSSION

### A. STANDARDS OF REVIEW

■ When an administrative decision involves expertise regarding either complex subject matter or fundamental policy formulation, we defer to the decision if it has a reasonable basis. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987); *Mobil Oil Corp. v. Local Boundary Comm'n*, 518 P.2d 92, 98 (Alaska 1974). In contrast, we exercise our independent judgment when interpreting a statute which does not implicate an agency's special expertise or determination of fundamental policies. *See City of Valdez v. State, Dep't of Community & Regional Affairs*, 793 P.2d 532, 533 n. 6 (Alaska 1990).

■ Constitutional issues present questions of law to which this court applies its independent judgment. They "should be given a reasonable and practical interpretation

** Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. The validity of the 1989 incorporation of the Borough is currently before this court on a challenge from villages in the Nushagak watershed. *See Lake & Peninsula Borough v. Local Boundary Comm'n.*, Nos. S–5476/5485.

in accordance with common sense." *Arco Alaska, Inc. v. State*, 824 P.2d 708, 710 (Alaska 1992).

### B. ALASKA'S CONSTITUTION AND STATUTES REQUIRE AN INQUIRY INTO WHETHER IT IS REASONABLE OR PRACTICABLE FOR A BOROUGH TO PROVIDE SERVICES BEFORE INCORPORATION OF A CITY IS ALLOWED

1. Statutory and constitutional provisions.

Article X, section 1 of the Alaska Constitution states that the purpose of article X is

to provide for maximum local self-government with a minimum of local government units, and to prevent duplication of tax-levying jurisdictions.

Article X, section 5 of the Alaska Constitution provides in part:

Service areas . . . may be established . . . by the assembly, subject to the provisions of law or charter. A new service area shall not be established if, consistent with the purposes of this article, the new service can be provided by . . . incorporation as a city. . . .

Alaska Statute 29.05.021(b) provides:

A community within a borough may not incorporate as a city if the services to be provided by the proposed city can be provided on an areawide or nonareawide basis by the borough in which the proposed city is located. . . .

Alaska Statute 29.35.450(b) provides:

A new service area may not be established if, consistent with the purposes of art. X of the state constitution, the new service can be provided by an existing service area . . . or by incorporation as a city.

2. Arguments presented.

Keane contends that AS 29.05.021(b) prohibits the incorporation of a city when formation of a service area is theoretically possible, or at least when formation of a service area is "reasonable" or "practicable." Keane asserts that the Borough could reasonably and practically provide the services desired by the Incorporators as evidenced by the LBC's statement acknowledging that the Borough "could, on a service area basis, provide other services needed or desired by the residents of Pilot Point." [2]

The LBC argues that Keane's interpretation of AS 29.05.021(b) is contrary to AS 29.35.450(b), constitutional law and the relevant interpretive regulation, 19 Alaska Administrative Code (AAC) 10.020(a), as well as the LBC's power to base its decision on fundamental policy considerations. The LBC contends that (1) Keane's interpretation would force a borough to provide services regardless of whether the borough "wants" to provide them, and (2) a borough cannot be "required" to establish a service area.

The Borough argues that even if AS 29.05.021(b) is construed to require boroughs to create new service areas, it is exempt from its provisions because of its home rule status.[3] The Borough argues that article X,

---

2. Arguing as amicus curiae, the Borough contends that it "has never provided, nor does it now provide, either on an areawide or a nonareawide basis, the services that Pilot Point proposed to provide for itself through incorporation." It further argues that state law does not suggest that, "in the absence of such services already being provided, the Borough was somehow obligated to create a service area in preference to having a local community incorporate in order to provide needed municipal services." In addition, the Borough has established a preference for incorporation over establishment of a new service area when necessary services are not already provided. *See* Lake & Peninsula Borough, Municipal Code § 10.01.010(C).

3. A home rule municipality "is a city or a borough that has adopted a home rule charter, or

. . . is a unified municipality. [It] has all legislative powers not prohibited by law or charter." AS 29.04.010; *see* Alaska Const. art. X, § 11. In contrast, a general law municipality "is an unchartered borough or city. It has legislative powers conferred by law." AS 29.04.020. General law municipalities are of five classes, two of which are first and second class boroughs. AS 29.04.030. The powers of first and second class boroughs are set forth at AS 29.35.200, .210. The concepts of "general" and "home rule" are not exclusive. A first class city or first class borough may adopt a home rule charter. Alaska Const. art. X, § 9; *see generally*, Thomas A. Morehouse & Victor Fischer, Institute of Social, Economic & Government Research, *Borough Government in Alaska* 56–59 (1971).

Alaska Statute 29.10.200 provides in part: "Only the following provisions of this title apply

section 5 of the Alaska Constitution allows the creation of service areas only when other options, including incorporation of a city, are not available.

Keane responds that article X, section 5 of the Alaska Constitution, when read in conjunction with article X, section 1, allows incorporation of a city only when a service area could not be created to provide the same services, because incorporation of a city will increase the number of local government units and tax-levying jurisdictions.

### 3. Interpretation of the law.

We conclude that AS 29.05.021(b) is not in conflict with either AS 29.35.450(b) or article X, section 5 of the Alaska Constitution. Alaska Statute 29.35.450(b), which follows the language of article X, section 5, is a limitation on the *creation of new service areas*.[4] It provides that a new service area may not be established if the new service can be provided by another means such as incorporation of a city. In contrast, AS 29.05.021(b) is a limitation on the *incorporation of cities*. It disallows incorporation when the desired services can be provided by a borough on an *areawide or nonareawide* basis. A home rule borough can provide services on an areawide or nonareawide basis without resort to a service area.[5]

It is reasonable to interpret AS 29.35.450(b) and article X, section 5 as preferring incorporation of a city over the creation of new service areas. This interpretation is supported by legislative history and is not inconsistent with article X, section 1 of the Alaska Constitution.[6] Constructing a barrier to approving an excessive number of government units does not prohibit the cre-

to home rule municipalities as prohibitions on acting otherwise than as provided...." The section continues, listing the applicable sections of the code. Alaska Statute 29.05.021(b) is not listed. When the Alaska Legislature revised the municipal code in 1975, it elaborated on the purpose of AS 29.10.200:

Home rule limitations are gathered together and listed in one place in article 2 of the chapter (Sec. 29.13.010) [renumbered to 29.10.200 in 1985]. The listing makes explicit the legislative intent as to which provisions of the code apply to home rule municipalities, as prohibitions on acting otherwise than as provided, and which do not. Additionally, the provisions themselves contain a specific reference making them applicable to home rule municipalities. The listing and specific references in the provisions are intended to coincide. (As additional provisions of law are enacted subsequent to the time the code takes effect, provisions which are intended to apply to home rule as well as to general law municipalities as prohibitions on acting otherwise than as provided should make a specific reference to home rule municipalities within the provision and should, under the form of the new code, also be included in the listing under Sec. 29.13.100, so as to maintain clearly the legislative distinction as to which code provisions apply to home rule municipalities and which do not.)

1972 House Journal 1720. It appears from the legislative history that AS 29.05.021(b) is inapplicable to home rule municipalities. *See Faipeas v. Municipality of Anchorage,* 860 P.2d 1214, 1222 n. 3 (Alaska 1993) (Moore, C.J., dissenting).

4. A service area "provide[s] specialized services in a borough ... [that are] not provided on an areawide or nonareawide basis in the borough, or a higher or different level of service than that provided on an areawide or nonareawide basis." AS 29.35.450(a).

5. As a home rule borough, the Lake & Peninsula Borough is necessarily a first class borough. Alaska Const. art. X, § 9; *see also* AS 29.35.200(c) ("[A] first class borough may, on an areawide basis, exercise a power not otherwise prohibited by law if the power has been acquired in accordance with AS 29.35.300."); AS 29.35.200(a) ("A first class borough may exercise by ordinance on a nonareawide basis any power not otherwise prohibited by law.").

6. *See* Morehouse & Fischer, *supra,* at 42 ("The stated purpose of preventing duplication of tax levying jurisdictions and providing for a minimum of local government units was directly responsible for [article X, section 5 of the Alaska Constitution]."); *see also* 4 Proceedings of the Alaska Constitutional Convention (PACC) 2714–15 (January 20, 1956) (Delegate Rosswog stated that the main intention of section 5 was "to try not to have a lot of separate little districts set up ... handling only one problem.") It is noteworthy that an amendment to eliminate the option of "incorporation as a city" from article X, section 5 was defeated by the convention. 4 PACC 2712–17 (January 20, 1956).

Indeed, the LBC has recognized that the provisions for service areas in article X, section 5 would be "particularly applicable to conditions in Alaska. Thus many areas which have not yet attained a sufficient tax base or population to incorporate as a city will be assisted." Local Boundary Commission, First Report to the Second Session of the First Alaska State Legislature, at I–7 to I–8 (1960).

ation of them when they are necessary.[7] Whether a service area or a city is established, another government unit is created. If numerous service areas are set up supplying only one or two services each, there is the potential for an inefficient proliferation of service areas. In contrast, once a city is established, it can provide many services, and other communities can annex to the city in the future.[8] Although the framers entertained the idea of unified local governments, they realized that the need for cities still existed.[9]

Based on the above discussion, we interpret AS 29.05.021(b) as follows: when needed or desired services can be reasonably and practicably provided on an areawide or nonareawide basis by the borough, they should be.[10] As discussed *supra*, this inquiry is not limited to an evaluation of service areas. When it is established that the services cannot be provided reasonably or practicably, then the LBC is required to consider other available options. We also clarify that

there is a statutory and constitutional preference for incorporation of cities over the establishment of new service areas. We believe these to be reasonable and practical interpretations of the Alaska Constitution in accordance with common sense. *See Arco Alaska*, 824 P.2d at 710.

4. The LBC erred in its incorporation determination by failing to address whether the Borough could reasonably and practicably provide the desired services.

■ Keane argues that even if a requirement of "reasonableness" or "practicability" is read into AS 29.05.021(b), the LBC provides no evidence which supports a conclusion that formation of a service area is not "reasonable" or "practicable." Keane contends that a Borough's support of a petition for incorporation is not equivalent to a refusal to create a new service area.

At issue is former 19 AAC 10.020,[11] a regulation which interprets AS 29.05.021(b)

---

7. Victor Fischer, an authority on Alaska government, "advises that the 'minimum of local government units' language ... was aimed at avoiding special districts such as health, school, and utilities districts having separate jurisdiction or taxing authority. He notes no policy was stated limiting the number of cities and boroughs." *DCRA Report to the Alaska Local Boundary Commission on the Proposed Yakutat Borough Incorporation and Model Borough Boundaries for the Prince William Sound, Yakutat, Cross Sound/Icy Strait Regions* 50 (December 1991) [hereinafter *Yakutat Report* ]. Nonetheless, in *City of Douglas v. City and Borough of Juneau*, 484 P.2d 1040 (Alaska 1971), we noted that article X, section 1 "expresse[s] [a] constitutional policy of minimizing the *number* of local government units." *Id.* at 1044 (emphasis added). In addition, the DCRA has concluded that "the constitutional language 'minimum of local government units' does admonish the LBC to guard against approving the creation of an excessive number of local governments." *Yakutat Report, supra* at 52. We note that neither view supports the addition of unnecessary government units.

8. Delegate Doogan referred to a city as a "combination of service areas within a borough." 4 PACC 2652 (January 19, 1956).

9. "In an attempt to simplify local government and prevent the overlapping of governmental functions," consistent with the purpose of article X, section 1, "the framers of the constitution ... considered establishing a single unit of local government with the abolition of cities altogether."

*City of Homer v. Gangl*, 650 P.2d 396, 400 (Alaska 1982). Although advantageous, the framers considered it a "concept whose time had not yet come." *Id.* "Section 2 of Article X presents the compromise solution: 'All local government powers shall be vested in boroughs and cities. The state may delegate taxing powers to organized boroughs and cities only.' " *Id.* (quoting Alaska Const. art. X, § 2).

10. We reject Keane's interpretation that incorporation of a city is allowed only when it is theoretically impossible for a borough to provide services. To accept such an interpretation would render the LBC powerless to approve the incorporation of any new city that is located within an organized borough because all organized boroughs have the power to provide services. *See* Alaska Const. art. X, § 5; AS 29.35.450.

11. Former 19 AAC 10.020(a) was revised and renumbered in 1992. AAC Register 123. The new regulation does not mention remoteness. It reads:

In accordance with AS 29.05.021(b), a city may not incorporate as a city if essential city services can be provided more efficiently or more effectively by annexation to an existing city, or can be provided more efficiently or more effectively by an existing organized borough.

19 AAC 10.010(b).

Keane argues that regardless of whether the LBC relied on former 19 AAC 10.020(a), it does

and assists the LBC in determining whether the formation of a service area is reasonable or practicable. It provided in part:

(a) The commission will not allow the incorporation of a community located within an organized borough unless the petitioners demonstrate to the satisfaction of the commission that the services to be exercised by the proposed city cannot be reasonably or practicably exercised by the borough on an areawide or non-areawide basis. The commission will consider the requirement of this subsection satisfied if:

. . . .

(2) the commission determines that the city is remote from the borough seat and is not connected to the borough seat by the state highway system.

Keane asserts that the LBC raises for the first time on appeal to the superior court its finding of remoteness and attendant reliance on 19 AAC 10.020. The LBC asserts that it did not "overlook" the application of 19 AAC 10.020. It notes the applicability of 19 AAC 10.020 in its Findings and Conclusions:

AS 29.05.011 sets out four standards for the LBC to apply to all petitions for city incorporation. A fifth standard, set out in AS 29.05.021(b), applies only to communities such as Pilot Point which are in organized boroughs. The Alaska Administrative Code, 19 AAC 10.010 and 10.020, gives the criteria which the LBC, in its discretion, should consider when applying the statutory standards, although the Commission is not limited to the listed factors.

Remoteness was part of the record before the LBC. The fact that Pilot Point is not connected to the borough seat, King Salmon, by any road, and the fact that Pilot Point is eighty-five air miles from King Salmon, were mentioned in the Incorporator's petition as

well as the DCRA reports to the LBC. The LBC argues that there was no need to discuss specifically in its decision remoteness or its effect on the criteria of 19 AAC 10.020(a)(2).

■ The LBC is not required to set forth findings of fact in its incorporation decisions. *Mobil Oil Corp. v. Local Boundary Comm'n*, 518 P.2d 92, 97 (Alaska 1974). In *Mobil Oil*, we stated that "[t]he special function of the [LBC], to undertake a broad inquiry into the desirability of creating a political subdivision of the state, makes us reluctant to impose an independent judicial requirement that findings be prepared." *Id.* We stated that we were able to determine the basis of the LBC's decision from our own review of the entire record. *Id.*

Keane responds that where a decisional document shows on its face that an important factor was not considered, the court should remand the matter for further consideration. *See, e.g., Southeast Alaska Conservation Council, Inc. v. State*, 665 P.2d 544, 549 (Alaska 1983). We agree.

The LBC's decision allowing incorporation provides:

Given the lack of any city close to the community of Pilot Point, annexation to an existing city is impractical. *While the Lake & Peninsula Borough could, on a service area basis, provide other services needed or desired by the residents of Pilot Point, the Borough Assembly formally supports incorporation of the city.* Therefore, service area formation does not appear to be a viable option at this time.

The LBC argues the applicability of 19 AAC 10.020, notes its importance in the consideration of the statutory standards for incorporation, and acknowledges the facts that

not govern this appeal. Keane asserts that the court needs to follow the law in effect at the time it renders its decision, not the law in effect at the time of the administrative decision. However, AS 44.62.240 provides:

If a regulation adopted by an agency under [the Administrative Procedure Act (APA)] is primarily legislative, the regulation has prospective effect only. A regulation adopted under [the APA] that is primarily an "interpretative regulation" has retroactive effect only if the agency adopting it has adopted no earlier

inconsistent regulation and has followed no earlier course of conduct inconsistent with the regulation. Silence or failure to follow any course of conduct is considered earlier inconsistent conduct.

The earlier regulation included a remoteness factor; the new regulation does not include this factor and is inconsistent with the prior regulation. Thus, regardless of whether this court interprets 19 AAC 10.020(a) as a legislative or interpretative regulation, its application is *prospective* only.

support a finding of remoteness. Nonetheless, we cannot ascertain from the record whether the LBC made a "reasonableness" or "practicability" determination, and if it did, whether it found a lack of the two based on a remoteness theory. The LBC does not refer to the facts concerning a remoteness determination in its conclusions. Its decision appears to be based solely on the fact that the residents of Pilot Point wanted to incorporate and that the Borough Assembly formally supported the incorporation.[12] There is no indication that a determination of the "reasonableness" or "practicability" of a service area was considered. Therefore, we remand to the LBC to make findings consistent with this opinion.

### C. THE LBC'S DECISION WAS NOT PREDICATED ON AN ILLEGAL TAX

Approval of the incorporation petition by local voters was contingent on their simultaneous approval of a proposed three percent tax on the sale of fish within the city. Keane argues that this tax is illegal based on three theories: (1) the tax violates AS 29.45.090(b);

(2) the tax denies due process of law to the taxpayers; and (3) the tax violates article IX, section 6 of the Alaska Constitution. Each of these areas is discussed below.

1. Alaska Statute 29.45.090(b)(1) does not apply to sales taxes.

Alaska Statute 29.45.090(b)(1) provides that "[A] municipality ... may not levy taxes ... that will result in tax revenues from all sources exceeding $1,500 a year for each person residing within the municipal boundaries." Keane asserts that the tax limitation of AS 29.45.090(b)(1) applies to sales taxes [13] because the language refers to "all sources" and that the three percent tax exceeds the amount allowed.[14] The LBC responds that Keane's interpretation of AS 29.45.090(b)(1) is inconsistent with municipal taxation practices as well as rules of statutory construction.[15]

Alaska Statute 29.45.090 provides in part:

(a) A municipality may not, during a year, levy and tax for any purpose in excess of three percent of the assessed *value*

---

**12.** The Borough has formulated and adopted a "Philosophy and Mission Statement" favoring community self-determination and limiting the size and scope of Borough government and services. Minutes of Joint Borough Assembly/Planning Committee Meeting, March 16, 1992.

**13.** Keane contends that, historically, the limitation on municipal taxes applied to all taxes. Section 16–4–1 Alaska Compiled Laws Annotated (ACLA) (1949) provided:

No incorporated town or municipality shall levy *any* tax for any purpose in excess of 3 per centum of the assessed valuation of property within the town in any one year.

(Emphasis added). This language was amended in 1960 by a proviso that the three percent limitation did not apply to taxes levied for bond payments. Ch. 94, § 1, SLA 1960, codified as AS 29.30.020. The general tax limitation was codified in 1962 as AS 29.30.010. It provided:

No incorporated town or municipality may levy *and* tax for any purpose in excess of three per cent of the assessed valuation of property within the town in any one year.

(Emphasis added). Keane claims that the change of "any" to "and" is a typographical error. There is no legislative history available on this change. A staff member of the Legislative Reference Library opines that in 1962 there was a conscious effort to eliminate as many "any's" as possible from the code. Keane contends that AS 29.30.010 was and remained a generic limita-

tion on all forms of municipal taxation. AS 29.30.010 was recodified without substantial change as AS 29.53.050 (1972). Ch. 118, § 2, SLA 1972. AS 29.53.050 was amended by adding subsection (b) in 1973. Ch. 1, § 4, FSSLA 1973. AS 29.53.050(b) expanded on the three percent limitation by providing two alternative per capita tax limitations. Keane contends that the valuation formula used in subsection (b)(2) was, for the first time, a limit specifically restricted to property taxes, but that (b)(1) refers to "any" taxes. AS 29.45.090 is the recodification of AS 29.53.050 as amended in 1973. Ch. 74, § 12, SLA 1985.

**14.** Keane contends the Incorporators' proposal will produce revenues that will range from $6,679.25 per capita to $10,613.21 per capita. These figures are derived from the DCRA's estimate of the revenues that will be produced from the proposed tax. The DCRA estimates that the three percent tax will bring in approximately $354,000 to $562,500 annually. Keane divides this amount by 53 (the number of residents according to the 1990 census).

**15.** The Incorporators contend that the legality of the tax is outside the scope of this review and that a challenge to the allegedly illegal tax will not affect the incorporation process. AS 29.45.710 allows incorporation of a second class city to be dependent on the passage of a tax proposition.

*of property* in the municipality. *All property on which a tax is levied* shall be taxed at the same rate during the year.

(b) A municipality, or combination of municipalities occupying the same geographical area, in whole or in part, may not levy taxes.

(1) that will result in tax revenues from all sources exceeding $1,500 a year for each person residing within the municipal boundaries; or

(2) *upon value that, when combined with the value of property otherwise taxable by the municipality,* exceeds the product of 225 percent of the average per capita assessed *full and true value of property* in the state multiplied by the number of residents of the taxing municipality.

(Emphasis added). When subsection (b)(1) is read in context with subsections (a) and (b)(2), it appears that the entire section is dealing with property taxes. *See* 2B Norman J. Singer, *Sutherland Statutory Construction* § 46.05 (5th ed. 1992) [hereinafter *Sutherland* ] ("A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other so as to produce a harmonious whole.").

The LBC correctly contends that property valuation is a basic principle inherent throughout AS 29.45. We can consider these sections *in pari materia* as they relate to the method by which municipalities assess, levy

and collect property taxes.[16] AS 29.45.010. *See* 2B *Sutherland, supra,* § 51.03 ("Statutes are considered to be in pari materia when they ... have the same purpose or object.").

In addition, the DCRA reports that the State Assessor interprets AS 29.45.090(b)(1) as applying only to property taxes. A "contemporaneous and practical interpretation of a statute by the executive officer[ ] charged with its administration and enforcement ... constitutes an invaluable aid in determining the meaning of a doubtful statute." 2B *Sutherland, supra,* § 49.03; *see also Casperson v. Alaska Teachers' Retirement Bd.,* 664 P.2d 583, 586–87 (Alaska 1983) (Compton, J., dissenting).

Furthermore, AS 29.45.090 assumes that the prohibited tax is of an amount capable of predetermination. This suggests that it applies to property tax only. As a practical matter, the amount of property tax to be levied and collected in an upcoming year is capable of exact calculation based upon the amount of assessed, taxable property in a municipality and the establishment of an annual mill rate. In contrast, the amount to be collected in a fish sales taxes in an upcoming year can only be estimated: revenues are dependent on the strength of the salmon runs and the price paid per pound to the fishermen.[17]

After considering the language of the statute, its legislative history and underlying policies, we conclude that AS 29.45.090 is inapplicable to sales taxes.[18] We believe this

---

**16.** Keane asserts that the language of AS 29.45.090(b)(1) is clear and, therefore we should not look at extrinsic evidence. However, this court has rejected such a mechanical application of the plain meaning rule. *Alaska Pub. Employees Ass'n v. City of Fairbanks,* 753 P.2d 725, 727 & n. 5 (Alaska 1988). When AS 29.45.090(b)(1) is read in context, it appears that it applies to property, not sales, taxes.

The LBC correctly points out that the statutes addressing municipal property taxation are separate from those addressing sales taxes. However, the titles of chapters and articles are not part of the general and permanent law of the state. AS 01.05.005; *see Ketchikan Retail Liquor Dealers Ass'n v. State, Alcoholic Beverage Control Bd.,* 602 P.2d 434, 438 (1979), *modified,* 615 P.2d 1391 (Alaska 1980). Nevertheless, it seems logical that the legislature would include a limitation on sales taxes in the article specifically discuss-

ing them rather than in the municipal property article.

**17.** ·We are not persuaded otherwise by Keane's argument that the per capita limit could be administered by exempting transactions after the taxpayer has paid $1,500 in other local sales taxes. It would be the taxpayer's responsibility to claim the exemption and to establish the amount of taxes already paid. Keane contends that administrative difficulties are not grounds for departing from the clear language of a statute. *See Alaska Pub. Employees Ass'n,* 753 P.2d at 728 n. 6 (holding that arguments that a statute "'leads to too many problems,' is a matter for the legislature, not this court.").

**18.** Keane also argues that because the former six percent limitation on sales taxes has been repealed, AS 29.45.650(g); Ch. 159, §§ 1, 2, SLA

interpretation to be the most persuasive in light of precedent, reason and policy. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

2. The sales tax does not violate due process.

■ Keane argues that the three percent sales and use tax violates due process of law because it confers no benefit upon the taxpayers. The LBC contends that the City of Pilot Point plans to provide shore-based facilities and to offset the effects of the seasonal influx of fishermen to the community.[19] The Incorporators also contend that the taxpayers will benefit from the waste disposal, storage, waterfront and fresh water improvements that the city proposes to provide. Keane responds that the majority of the taxpayers have no shore-based presence.

As long as services are available, the issue of usage by the taxpayers is irrelevant. *North Slope Borough v. Puget Sound Tug & Barge,* 598 P.2d 924, 928 (Alaska 1979). Therefore, we conclude that the three percent sales and use tax does not violate the taxpayers' due process rights.

3. The sales and use tax does have a public purpose.

■ Keane also contends that the proposed tax violates article IX, section 6 of the Alaska Constitution, which provides in part that "[n]o tax shall be levied ... except for a

public purpose." Keane asserts that the three percent tax violates the public purpose clause because the Incorporators' petition anticipated the generation of fifty percent more revenue than needed to operate the city as well as the establishment of a permanent fund.[20] The LBC responds that (1) the DCRA considered the petitioner's anticipated revenues overly optimistic, and (2) even if a city has excess tax revenues it is not prohibited from establishing a savings account to draw on in less prosperous times.

The phrase "public purpose" cannot be precisely defined; each case must be judged on its own particular facts and circumstances. *DeArmond v. Alaska State Dev. Corp.,* 376 P.2d 717, 721 (Alaska 1962).

[I]f the object is beneficial to the inhabitants and directly connected with the local government it will be considered with favor as a ... public purpose.... To justify a court in declaring a tax invalid on the ground that it was not imposed for a public purpose, the absence of a public interest must be clear and palpable.

16 Stephen M. Flanagan, *McQuillin, Municipal Corporations* § 44.35, at 114–15 (3rd ed. 1984). We conclude that establishment of a savings account for future public purposes appears to be a prudent decision with a public purpose.

1990, there will be no barrier to excessive taxation through the device of a sales tax unless this court construes AS 29.45.090(b)(1) as a limitation on sales taxes. The LBC and Incorporators respond that (1) if AS 29.45.090(b)(1) is interpreted to include sales taxes, then the lifting of the six percent limitation would be meaningless, and (2) if AS 29.45.090(b)(1) and its predecessors applied to "all" taxes, then they were in irreconcilable conflict with the prior six-percent sales tax limitation. We agree with the LBC. The absence of a limitation on sales taxes is a matter for legislative resolution. *See, e.g., Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 610, 101 S.Ct. 2946, 2950, 69 L.Ed.2d 884 (1981) ("[T]he appropriate level or rate of taxation is essentially a matter for legislative, and not judicial, resolution.").

19. Because of the salmon industry, Pilot Point's population explodes from approximately 80 persons in the winter to more than 2,500 during the summer.

20. Originally the Incorporators had desired to use some of the tax revenues for a permanent fund with dividends to be paid to the citizens of Pilot Point. However, the city's representative later suggested that the purpose of the permanent fund would be to generate revenues for the city, not for its residents. After much debate, the city council has passed an "Investment Fund Reserve Account" that provides that 25% of any sales and use taxes collected will be placed in a conservative investment portfolio to provide revenue during poor fishing seasons. There is also a provision for an "Educational Endowment Fund." The ordinances passed by Pilot Point provide for other funds that may be created as needed by resolution.

The Attorney General has opined that the Alaska Constitution does not appear to prohibit municipalities from dedicating public funds to such an account. 1988 Informal Op.Att'y Gen. No. 663–88–0525 (July 29, 1988).

## D. THE SUPERIOR COURT DID NOT ABUSE ITS DISCRETION IN DENYING A STAY

■ Keane argues that Alaska Appellate Rule 603(a)(2) does not require any consideration of the merits of the appeal, the probability of success, a finding of irreparable harm, or adequate protection to the appellee. Keane asserts that the cases relied on by the LBC and the Incorporators that considered these elements are no longer applicable because they have been superseded by Appellate Rule 603.[21] Keane argues that a $750 cash deposit in the amount of a cost bond satisfies the requirements of a supersedeas bond under Alaska Appellate Rule 603(a)(2) by application of Alaska Appellate Rule 602(f). He cites *Pipeliners Union 798, United Association v. Alaska State Commission for Human Rights*, 681 P.2d 330 (Alaska 1984), to support the proposition that he is entitled to a stay unless it would be contrary to the public interest. The *Pipeliners* court concluded that "[a] monetary enforcement judgment may be stayed as a matter of right upon the posting of an appropriate supercedeas [sic] bond under Appellate Rule 603(a)(2)." *Id.* at 336. However, Keane's reliance on *Pipeliners* is misplaced; *Pipeliners* involved a *monetary* judgment.

The distinction between monetary and non-monetary judgments is clear in Rule 603(a)(2) which provides in part:

When an appeal is taken, the appellant may obtain a stay of proceedings to enforce the judgment by filing a supersedeas bond.... The filing of a supersedeas bond does not prohibit the court from considering the public interest in deciding whether to impose or continue a stay on that portion of an administrative or district court judgment *which is not limited to monetary relief.*

(Emphasis added). Thus stays not involving money judgments are not mandatory upon the mere issuance of a supersedeas bond, and certainly are not mandatory on the issuance of a $750 cost bond.

■ Accordingly, the superior court has discretion to grant a stay concerning a non-monetary judgment. This determination is guided by the "public interest." Keane contends that it was in the public interest to grant a stay because disincorporation of a municipality substantially disrupts the life and livelihood of those associated with the municipality. The LBC and the Intervenors respond that the public interest cannot be protected with a $750 cost bond: this amount does not come close to the amount spent in reviewing the incorporation petition, holding meetings and hearings, holding an election, or the loss of tax revenues if a stay is granted. Moreover, certain public interests would be advanced by *denying* the stay: the right to petition and vote for incorporation, and the right to vote for a tax measure to insure the financial viability of the city. We find the public interest arguments advanced by the LBC and the Intervenors persuasive.

Additionally, we clarify that the test presented in *A.J. Industries, Inc. v. Alaska Public Service Commission*, 470 P.2d 537 (Alaska 1970), is still applicable:

While the rule requiring a clear showing of probable success applies in situations where the party asking for relief does not stand to suffer irreparable harm, or where the party against whom the injunction is sought will suffer injury if the injunction is issued, a different rule applies where the party seeking the injunction stands to suffer irreparable harm and where, at the same time, the opposing party can be protected from injury.

---

21. *See, e.g., Keystone Servs., Inc. v. Alaska Transp. Comm'n*, 568 P.2d 952 (Alaska 1977). Keystone involved the superior court's denial of a stay from a final order of the Alaska Transportation Commission, pending appeal of the order to the superior court. The *Keystone* court noted that the issue presented was similar to the issue addressed in *A.J. Industries, Inc. v. Alaska Public Service Commission*, 470 P.2d 537 (Alaska 1970), namely: "whether the superior court had properly denied a preliminary injunction in connec-tion with an order by another regulatory agency of the state." *Id.* at 954. The court then utilized the test articulated in *A.J. Industries* to determine whether the issuance of the stay was proper. *Id.* at 954. The *A.J. Industries* test requires consideration of the following factors: (1) whether the plaintiff is faced with irreparable harm, (2) whether the opposing party will be adequately protected, and (3) whether the plaintiff has raised serious and substantial questions going to the merits of the case. *Id.*

*Id.* (footnotes omitted).[22]

Because Keane has made no showing of either irreparable harm or probability of success on the merits, we conclude that the superior court did not abuse its discretion in denying Keane's motion for a stay.[23]

### E. THE SUPERIOR COURT DID NOT ERR IN ALLOWING THE INCORPORATORS TO INTERVENE

The Incorporators argue that they were properly allowed to intervene as a matter of right. In the alternative, they argue that they were entitled to permissive intervention pursuant to Alaska Civil Rule 24(b). The LBC supports the intervention of the Incorporators, noting that "[a] newly incorporated entity has a direct interest in any legal challenge to its existence."

Keane argues that if intervention was available it was permissive, not as of right. However, Keane asserts that even permissive intervention should have been denied in this case because of the increased complications of tripartite litigation.

Assuming, *arguendo*, that intervention as a matter of right was improper, we conclude that the Incorporators were properly allowed permissive intervention. Permissive intervention is proper "when an applicant's claim or defense and the main action have a question of law or fact in common." Alaska R.Civ.P. 24(b). The Incorporators' claims do share common issues of law and fact with the LBC: they both want to uphold the LBC decision.

An additional factor that a court must consider before allowing intervention is "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.* This court has recognized that "additional parties are ... the source of additional questions, briefs, objections, arguments and motions;" where no new issues are presented, it is most effective to allow participation by a brief amicus curiae

rather than by intervention. *State v. Weidner*, 684 P.2d 103, 114 (Alaska 1984).

The Incorporators have raised additional arguments and interests that are not raised by the LBC, i.e., that the legality of the sales tax is not properly before the court, and that if a stay were issued, a substantial bond would be needed to cover the amount of the city's lost revenues and grants from the State and Federal governments. Furthermore, the intervention does not appear to have unduly delayed or prejudiced the original parties. Keane merely asserts that there are increased complications in tripartite litigation; he fails to persuade us that he is thereby prejudiced. Therefore, we conclude that the superior court did not abuse its discretion in allowing the Incorporators to intervene. *See id.* at 113.

### F. THE SUPERIOR COURT ERRED IN ITS AWARDS OF ATTORNEY'S FEES BECAUSE KEANE WAS ENTITLED TO PUBLIC INTEREST STATUS

Keane contends that the superior court abused its discretion when it denied him public interest status and awarded attorney's fees to the Incorporators and the LBC. *See Citizens Coalition for Tort Reform, Inc. v. McAlpine*, 810 P.2d 162, 171 (Alaska 1991) ("We review the trial court's determination of public interest status under the abuse of discretion standard."). We agree.

The criteria for identifying a public interest suit are as follows: "(1) whether the case is designed to effectuate strong public policies; (2) whether, if the plaintiff succeeds, numerous people will benefit from the lawsuit; (3) whether only a private party could be expected to bring the suit; and (4) whether the litigant ... would lack sufficient economic incentive to bring the lawsuit if it did not involve issues of great public importance." *Carney v. State, Board of Fisheries,*

---

**22.** If the latter part of this standard comes into play, the court is to use a "balance of hardships" approach. The court will weigh "the harm that will be suffered by the plaintiff if an injunction is not granted, against the harm that will be imposed upon the defendant" if the injunction is granted. *A.J. Industries,* 470 P.2d at 540.

**23.** Because we conclude that the superior court did not abuse its discretion in denying the stay for the stated reasons, we do not need to reach the issue of whether the Incorporators would have been entitled to the equitable defense of laches had a stay been issued.

785 P.2d 544, 549 (Alaska 1990). All four factors must exist before a party is considered a public interest litigant. *Id.*

We conclude that Keane is a public interest litigant. First, this lawsuit was designed to effectuate public policy. Keane challenged an alleged violation of a policy of the Alaska Constitution that favors limiting tax-levying authorities. Keane also sought a determination that would clarify statutory limitations on municipalities' tax-levying powers. Each of these goals involves important public policies.

Second, numerous people will benefit from this lawsuit if Keane succeeds. Although Keane admits that "[t]he hundreds of fishermen of the Ugashik District would be the primary beneficiaries," defining boundaries of constitutional provisions will benefit the public at large. *See, e.g., Whitson v. Anchorage,* 632 P.2d 232, 234 (Alaska 1981); *Thomas v. Bailey,* 611 P.2d 536, 540 (Alaska 1980). Likewise, interpreting public laws will benefit the public. *See Girves v. Kenai Peninsula Borough,* 536 P.2d 1221, 1227 (Alaska 1975).

Third, it is reasonable to conclude that only a private party would be expected to bring this suit because the LBC's decision is supported by the DCRA.

Fourth, Keane lacked sufficient economic incentive to bring this suit. This appeal was directed at the formation of a municipality, rather than at the imposition of a tax; economic interests were affected only indirectly. Keane alleges that in this case the affected economic interest of a typical fisherman is quite small, approximately $555.55.[24] *See Citizens for the Preservation of the Kenai River, Inc. v. Sheffield,* 758 P.2d 624, 627 (Alaska 1988) (holding that whether a party is a public interest litigant depends on the interests of "typical members" rather than the interests of a single member). The economic interest of a typical fisherman in this case is not substantial and does not preclude Keane's public interest status.[25]

Keane satisfied all four of the necessary criteria to be considered a public interest litigant. We conclude that the superior court abused its discretion in denying Keane public interest status. Therefore, we reverse the awards of attorney's fees.[26]

## III. *CONCLUSION*

We conclude that AS 29.05.021(b) requires an inquiry into the reasonableness and practicability of having a borough provide the desired services. Therefore, we REMAND to the LBC to make such an inquiry. We conclude that the three percent sales and use tax is not limited by AS 29.45.090(b)(1), that it does have a public purpose, and that it does not violate taxpayers' due process. We AFFIRM the decisions of the superior court denying Keane's motion to stay proceedings pending appeal and allowing the Incorporators to intervene. Finally, we conclude that Keane is a public interest litigant and therefore REVERSE the superior court's awards of attorney's fees, and REMAND the issue of attorney's fees to the superior court for redetermination.

---

24. Approximately 700 fishing vessels and 200 setnetters participate in the Ugashik District fishery, and anticipated tax revenues are $500,000 annually. Dividing the $500,000 annual tax revenue by the 900 taxpayers yields an average tax burden of $555.55.

25. Although we have never set a dollar amount that either precludes or establishes public interest status, we opined in *Murphy v. City of Wrangell,* 763 P.2d 229 (Alaska 1988), that it might appear that a party lacked sufficient economic incentive to bring a lawsuit when the damages are "in the low four figures." *Id.* at 233. Nonetheless, we found substantial economic incentive precluding public interest status because Murphy could have recovered up to $25,000 plus punitive damages. *Id.*

26. Because we reverse the awards of attorney's fees, it is unnecessary to discuss Keane's contention that the awards were excessive.